[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 16, 2010
JOHN LEY
CLERK

No. 10-10097
Non-Argument Calendar
_____

Agency No. A089-215-653


DIANA ALEXANDRA CEDENO PINEDO,

Petitioner,


versus


U.S. ATTORNEY GENERAL,

Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(September 16, 2010)

Before BLACK, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Diana Alexandra Cedeno Pinedo ("Cedeno"), a citizen of Colombia, petitions this Court for review of the Board of Immigration Appeals' ("BIA") order reversing the immigration judge's ("IJ") finding that she was entitled to asylum under the Immigration and Nationality Act ("INA").  Specifically, Cedeno argues that the BIA committed several errors when analyzing her claim for asylum based on the Revolutionary Armed Forces of Colombia's ("FARC") "pattern or practice" of persecuting medical personnel who, like herself, oppose the FARC.[1]  After thorough review, we affirm the BIA's order.

I.

On May 4, 2007, Cedeno entered the United States as a non-immigrant visitor with authorization to remain until November 3, 2007.  On November 23, 2007, Cedeno applied for asylum, asserting that if she returned to Colombia she would be persecuted by the FARC, a guerilla organization, on account of her

---

[1]Cedeno also asks us to remand the case to the BIA in light of not only a pending motion before the BIA to reopen her case but also confusion regarding the basis for the IJ's decision to grant asylum, including whether the IJ may have implicitly granted asylum under 8 C.F.R. § 1208.13(b)(1)(iii)(B).  This aspect of her appeal can be quickly resolved, as neither ground provides a basis for remanding her case to the BIA.  Our review on appeal is limited to only considering issues and motions presented to and resolved by the BIA and contained in her petition for review.  See Fed. R. App. P. 15(a)(2); see also Stone v. INS, 514 U.S. 386, 405–06, 115 S. Ct. 1537, 1549 (1995) (stating that an alien may separately seek review of a subsequently denied motion to reopen).  In any event, any confusion over the IJ's basis for granting asylum is irrelevant.  We only review the IJ's decision to the extent that the BIA expressly adopts it.  Kueviakoe v. U.S. Att'y Gen., 567 F.3d 1301, 1304 (11th Cir. 2009).  Here, the BIA rejected the IJ's findings on which the alleged confusion exists and issued its own ruling denying asylum.

political opinion and membership in a particular social group. Cedeno asserts that FARC twice threatened to kill her after two FARC members were arrested when Cedeno transported them, as part of her volunteer work, to a hospital for treatment of their gunshot wounds.

On January 2, 2008, the Department of Homeland Security served Cedeno with a notice to appear in immigration court, charging her with being subject to removal under 8 U.S.C. § 237(a)(1)(B) for exceeding her authorized length of stay. Cedeno conceded her removability and thereafter appeared before the IJ on September 10, 2008, for a hearing on her application for refugee status.

At the hearing, she adduced the following evidence, which both the BIA and IJ found credible: To satisfy a community participation requirement as a medical student and to support the ultimately successful presidential campaign of Dr. Alvaro Uribe, Cedeno became involved with Seed Foundation. The Seed Foundation is a nonprofit organization supported by Radical Change and founded by members of that political party for the purpose of undertaking social and environmental projects in low income neighborhoods. As part of her volunteer work, Cedeno educated groups and community leaders about Uribe's proposals and participated in "health brigades," which provided medical assistance to at-risk and impoverished communities.

While volunteering in a health brigade in April 2005, Cedeno transported two men to the hospital because of the severity of their gunshot wounds. After she did this, the threats to Cedeno's life began. On June 2, 2005, two men riding a motorcycle handed her an envelope with her name and student identification number on it and immediately disappeared. Inside, a letter from the FARC specifically declared her a military target and threatened her life for supporting the government through Seed Foundation and for providing information to authorities that allegedly led to the arrests of the two gunshot victims.[2] The letter said that Cedeno could avoid death if she provided certain quantities of medicines. Because the letter was based on an incorrect assumption that she had provided the authorities with information, Cedeno ignored the letter, but nonetheless avoided public places and never went outside unescorted.

On August 8, 2005, while Cedeno was leaving school, two men, again riding a motorcycle, asked if she was Diana Alexandra and threw an envelope at her before she could respond. Inside, a letter from the FARC noted her noncompliance with the prior letter and again threatened her life. This letter again declared her a military target for her participation in Seed Foundation and for

---

[2]The letter itself is not part of the administrative record, but Cedeno established that it had been turned over to the Colombian Army for investigation.

supporting Uribe's government. If she wished to save her life, she had to provide the FARC with certain quantities of medicines within ten days. If not, she would turn up dead or missing like the others listed by name in the letter, including two fellow medical students whom Cedeno personally knew to have been murdered.

The second death threat caused Cedeno to suspend her studies indefinitely, fearing that the FARC could discover her whereabouts if she returned to the university or enrolled at another. To avoid the FARC, she and her mother moved far away to Palmira. While there, Cedeno cut ties with her contacts, did not work or go to school, changed her phone number, and largely remained inside. But during the holiday season in December 2005, she contacted her friends at the university who informed her that unknown individuals had visited her former university asking where she was. They also told her that Seed Foundation and her old residence had received calls asking for her and inquiring about her whereabouts. Based on the descriptions of the individuals and her friends' accounts of the tone of the phone calls, Cedeno believed that FARC members were still actively pursuing her.

Despite not receiving any direct threats since moving to Palmira, Cedeno applied for a tourist visa in December 2006 and came to the United States on May 4, 2007. She intended to eventually return home once the FARC had forgotten

5

about her. While in the United States, however, Cedeno was informed that calls to the Seed Foundation and her former residence became more aggressive. At that point, she decided to remain in the United States and apply for refuge on the grounds that if she returned to Colombia she would be persecuted on account of her political opinion[3] or membership in a particular social group.

In an oral decision, the IJ found that Cedeno failed to meet her burden of establishing past persecution on account of her actual or imputed political opinion. Instead, the IJ believed that the FARC targeted Cedeno not for her political opinion but rather for her involvement in the arrest of the two FARC members whom she transported to the hospital. Nevertheless, the IJ granted her asylum on the ground that she had a well-founded fear of future persecution, finding it both subjectively genuine and objectively reasonable that if Cedeno registered anywhere in Colombia to complete her medical studies, the FARC would discover her whereabouts and possibly take her life. In a conclusory footnote, the IJ stated that Cedeno's well-founded fear of persecution—based on her prior involvement with the politically affiliated Seed Foundation, documentary evidence that the

---

[3]In 2006, President Uribe was reelected to another four-year term, but was succeeded on August 7, 2010, by Juan Manuel Santos, a former Minister of National Defense in Uribe's government, who has overseen efforts to eradicate the FARC, including a military raid that killed a high-ranking FARC leader.

FARC has targeted medical personnel who do not comply with its requests, and her involvement in the arrest of the two FARC members—was sufficiently linked to one of the five statutory grounds on which a grant of asylum may be based. The IJ, however, did not specify which ground.

The BIA reversed the IJ's preliminary grant of asylum. The BIA agreed with the IJ's finding that Cedeno failed to establish past persecution on account of actual or imputed political opinion and noted that her allegations of past harm in that regard, namely threats, do not rise to the level of persecution. The BIA, however, took issue with the IJ's determination that Cedeno had established a nexus between her well-founded fear of future persecution and at least one statutory ground for asylum. The BIA stated that "the record does not indicate enough evidence from which we could find that the FARC targeted [Cedeno] for her political opinion, religion, membership in a particular social group, race, or nationality." In doing so, it cited to a BIA decision defining "social group" within the meaning of the INA and pointed out that, as the IJ correctly found, the FARC's interest in Cedeno was limited to her involvement in the arrest of the two FARC members. Lastly, the BIA found that relocation within Colombia to avoid harm was not unreasonable given that Cedeno did not personally receive any threats

after she relocated and that her parents continue to live in Colombia without incident.[4]

## II.

When, as here, the BIA issues its own opinion, we review only the decision of the BIA and those portions of the IJ's decision expressly adopted therein. Kueviakoe v. U.S. Att'y Gen., 567 F.3d 1301, 1304 (11th Cir. 2009). To the extent that the BIA's decision was based on a legal determination, our review is *de novo.* Mohammed v. Ashcroft, 261 F.3d 1244, 1247 (11th Cir. 2001). The BIA's factual determinations, however, are reviewed under the substantial evidence test, which provides that the BIA's decision "can be reversed only if the evidence 'compels' a reasonable fact finder to find otherwise." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230 (11th Cir. 2005). In undertaking that test, "we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc).

---

[4]In addition, the BIA *sua sponte* addressed and rejected Cedeno's applications for withholding of removal under the INA and relief under the Convention Against Torture. However, we do not address those aspects of the BIA's ruling. Cedeno withdrew those applications immediately upon the IJ granting her asylum and has not presented any arguments on appeal regarding those alternative grounds for refuge.

An alien who is present in the United States may apply for asylum pursuant to 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" is defined as an individual who is unwilling or unable to return to her country of residence "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). Persecution on account of one of those five protected grounds may be at the hands of the alien's government or at the hands of "non-governmental groups that [the alien's] government cannot control, such as the FARC." Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257 (11th Cir. 2006). In either case, "[t]he asylum applicant carries the burden of proving statutory 'refugee' status." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004); see also 8 C.F.R. § 208.13(a).

To establish a well-founded fear of future persecution, an alien must establish a fear of persecution on account of at least one of the five protected grounds. See Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1352 (11th Cir. 2009) (citing 8 C.F.R. § 208.13(b)(2)(i)). The alien can do so by either (1) presenting "'specific, detailed facts showing a good reason to fear that he or she

9

will be *singled out* for persecution on account of'" such a ground, Sepulveda, 401 F.3d at 1231 (quoting Najjar v. Ashcroft, 257 F.3d 1262, 1287 (11th Cir. 2001)), or (2) that a "pattern or practice" exists in the country of persecuting a group of persons similarly situated to her on account of a protected ground, 8 C.F.R. § 208.13(b)(2)(iii). Once this nexus has been established, the alien must also show that it would be unreasonable for her to relocate within the country to avoid the feared persecution. See 8 C.F.R. § 208.13(b)(2)(ii).

On appeal, Cedeno's challenge to the BIA's order is limited. She does not challenge the BIA's findings regarding lack of past persecution or that she failed to establish a well-founded fear of persecution on account of political opinion. Rather, Cedeno only argues (as she did before the BIA) that she has a well-founded fear of persecution on account of the FARC's pattern or practice of harming medical personnel who, like herself, oppose the FARC. Because she believes that the BIA either failed to adequately address this claim or committed several errors when doing so, she asks us to remand her case to the BIA.

Remand, however, is not necessary. Whether Cedeno should be granted asylum hinges in part on whether a group of medical personnel who oppose the FARC qualifies as a "social group" within the meaning of the INA. In evaulating the BIA's order, Cedeno assumes that her group meets this definition and in the

10

process overlooks a reference made by the BIA in a footnote appended to the phase "particular social group." That footnote refers to the BIA's opinion in Acosta, 19 I. & N. Dec. 211, 234 (1985), in which an alien sought asylum based on membership in a group with characteristics similar to the group Cedeno attempts to define. After giving meaning to the statutory phrase "particular social group," the BIA found that the group did not constitute a "social group" within the meaning of the INA:

> Applying the doctrine of ejusdem generis, we interpret the phrase 'persecution on account of membership in a particular social group' to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. Only when this is the case does the mere fact of group membership become something comparable to the other four grounds of persecution under the Act, namely, something that either is beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not be required to be changed. By construing 'persecution on account of membership in a particular social group' in this manner, we preserve the concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution.

11

In the respondent's case, the facts demonstrate that the guerrillas sought to harm the members of COTAXI, along with members of other taxi cooperatives in the city of San Salvador, because they refused to participate in work stoppages in that city. The characteristics defining the group of which the respondent was a member and subjecting that group to punishment were being a taxi driver in San Salvador and refusing to participate in guerrilla-sponsored work stoppages. Neither of these characteristics is immutable because the members of the group could avoid the threats of the guerrillas either by changing jobs or by cooperating in work stoppages. It may be unfortunate that the respondent either would have had to change his means of earning a living or cooperate with the guerrillas in order to avoid their threats. However, the internationally accepted concept of a refugee simply does not guarantee an individual a right to work in the job of his choice. Therefore, because the respondent's membership in the group of taxi drivers was something he had the power to change, so that he was able by his own actions to avoid the persecution of the guerrillas, he has not shown that the conduct he feared was 'persecution on account of membership in a particular social group' within our construction of the Act.

In re Acosta, 19 I. & N. Dec. 211, 233–34 (1985) (citation omitted),

overruled in part as stated in Mogharrabi, 19 I. & N. Dec. 439, 446–47

(1987).

Thus, the BIA relied on the reasoning in Acosta to summarily dispose of

Cedeno's claim for asylum based on the FARC's alleged pattern or practice of

persecuting medical personnel who either oppose the FARC or refuse to comply

with its demands. This was the extent of the BIA's discussion and thus the errors

Cedeno assigns to the analysis of that claim reflect a misunderstanding of the BIA's

order. We therefore affirm the BIA's denial of asylum, as Cedeno has presented no

12

argument in opposition to Acosta's rationale and thus fails to explain why the group she defines is a social group within the meaning of the INA.

Even assuming that Cedeno had preserved the issue on appeal, the BIA did not err in finding that her claim was not cognizable under the INA. We have previously stated that "[i]n restricting the grounds for asylum . . . based on persecution to five enumerated grounds, Congress could not have intended that all individuals seeking this relief would qualify in some form by defining their own 'particular social group.'" See Castillo-Arias v. U.S. Att'y Gen., 446 F.3d 1190, 1198 (11th Cir. 2006). We have therefore approved of Acosta's definition of social group as requiring a "'common, immutable characteristic . . . [that] is fundamental to [its members'] individual identities or consciences,' which is consonant with the purposes that underlie the other four grounds for refugee status or withholding of deportation under the INA." Id. at 1196–97 (quoting Acosta, 19 I. & N. Dec. at 233–34) (alterations in original). This formulation, we said, "strikes an acceptable balance between (1) rendering 'particular social group' a catch-all for all groups who might claim persecution, which would render the other four categories [for granting asylum] meaningless, and (2) rendering 'particular social group' a nullity by making its requirements too stringent." Id. at 1197.

The group in which Cedeno claims membership does not meet this required definition. She defines her group as medical workers engaged in outward manifestations of opposition to the FARC. Neither of these characteristics is immutable. Cedeno may cease being a member of this group by choosing not to re-enroll in medical school and forgoing her involvement in the Seed Foundation's health brigades. Her ability to avoid future persecution therefore remains fundamentally within her control and does not involve the FARC's targeting of either an immutable characteristic shared by the group or a shared characteristic that is so fundamental to the members' individual identities or consciences that it ought not be required to be changed.[5] Although Cedeno certainly has a compelling story, we cannot say that the BIA erred in determining that the social group she defines fails to provide a basis on which asylum may be bestowed. See Acosta, 19 I. & N. Dec. at 234 (noting that the "concept of a refugee simply does not guarantee an individual a right to work in the job of his choice").[6]

_____

[5]To the extent that Cedeno seeks asylum on account of membership in a social group defined as medical personnel who have failed to comply with the FARC, we likewise find this to be an insufficient basis for granting her asylum. Medical personnel who have failed to comply with the FARC undeniably share immutable characteristics in that their noncompliance and their then-status as medical personnel are historical facts that cannot be undone. But the record does not contain sufficient evidence to establish that the FARC persecutes members of such a group. Rather, the record suggests that the FARC's interest is limited only to those medical workers who are actively engaged in opposing the FARC through activities such as health brigades.

[6]Because Cedeno has failed to establish a well-founded fear of persecution on account of a protected ground, we need not resolve whether it would be unreasonable for her to relocate to

14

For the forgoing reasons, we AFFIRM the BIA's denial of Cedeno's application for asylum.

---

avoid that persecution.  <u>See</u> 8 C.F.R. § 208.13(b)(2)(ii).